**GOVERNMENT OF THE VIRGIN ISLANDS**
**Ex Rel. DELORES HYMAN, Petitioner**
v.
**EVANS PRINCE, Respondent**
J.D.R. No. 33-1968

Municipal Court of the Virgin Islands

Div. of St. Thomas and St. John

December 17, 1971

Bruce McGibbon, Esq., Assistant Attorney General, Charlotte Amalie, St. Thomas, V.I., *for plaintiff*

James A. Richards, Esq., Charlotte Amalie, St. Thomas, V.I., *for defendant*

JOSEPH, *Judge*

### MEMORANDUM OPINION

This case was originally tried by the Municipal Court of St. Thomas and St. John on February 5, 1969. Testimony in the case was also taken on two earlier occasions, January 14, 1969 and February 5, 1969. Judge Louis Hoffman decided against the relatrix, Delores Hyman, holding that the government had failed to establish by a preponderance of the evidence that the defendant, Evans Prince, was the father of a male child born to Miss Hyman on May 27, 1968.

The decision was appealed to the District Court by the Government on behalf of the relatrix. After reviewing the record, the District Court found that scientific evidence presented by the defense in an effort to disprove Prince's

paternity, was improperly admitted into evidence in the absence of a proper foundation being laid and as such was highly prejudicial to the relatrix. The court remarked that in the trial below there had been personal interchanges between counsel and witness and counsel and court as well as two "false starts", the contents of which may well have played a part in the court's consideration of the case. The District Court concluded that in the interest of justice and fairness to the relatrix a retrial was in order. The judgment of the Municipal Court was thereby vacated, and the case remanded for a new trial.

In accordance with the mandate, the new trial was held in the Municipal Court, Division of St. Thomas and St. John, on June 18, 1971. Defendant again elected to be tried by the court rather than by a jury. See 16 V.I.C., Section 292. Relatrix testified that Prince was the father of her illegitimate child born on the 27th of May, 1968. Defense denied the charge, contending that Prince did not have intercourse with relatrix during the period of conception in question and offering medical evidence purportedly showing defendant's incapacity for fathering a child during this same critical period. We will examine each of these defenses in turn as it relates to the evidence and testimony adduced at trial.

### DEFENDANT'S ACCESS TO RELATRIX AT THE TIME OF CONCEPTION

■ We note at the outset that the paternity proceedings under Chapter 11 of Title 16 of the Virgin Islands Code are considered in the nature of a quasi-criminal action and that no greater evidence is required to prove that a defendant is the father than is required in a civil proceeding. See 16 V.I.C., Section 303. In a civil or quasi-criminal action, the "burden of proof" is defined as the obligation of a party to meet the requirements of a rule of law that the

facts be proved either by a preponderance of the evidence or by clear and convincing evidence. See 5 V.I.C., Section 771(4). Proof by a preponderance of the evidence is a lesser burden than proof beyond a reasonable doubt, since factual determination in civil cases rests not on certainty, but on probability. Virgin Islands Labor Union v. Caribe Construction Co., 5 V.I. 191, 343 F.2d 364 (3rd Cir. 1965). The unsupported testimony of the mother in a paternity proceeding, if believed, satisfies the "proof by a preponderance of the evidence" standard and is sufficient to establish the paternity of the named father. Huntington v. Crowley, 414 P.2d 382, 64 C.2d 647 (1966).

Relatrix testified at trial that she first met Prince at a dance and had intercourse with him two weeks later, "around September or October (1967)". The sexual relationship apparently continued for several months, usually occurring on weekends. In stipulated testimony, Prince admitted the sexual relationship but alleged that he initially met Miss Hyman in October 1967, and the first instance of intercourse between them occurred in November of 1967.

■ Obviously the date of initial sexual intercourse between the parties is important. Although there was considerable evidence at trial showing the vagaries and uncertainties associated with determining the date of conception, we find that under no construction of the evidence could Miss Hyman's child born on May 27, 1968, have been conceived in November, 1967. In terms of normal gestational times and expert testimony at trial, ignoring contradictions for the moment, the suggested period of conception ranged anywhere from late August to late October. In view of his admitted sexual relationship with the relatrix however, we are reluctant to accept defendant's view of the dates involved. His access to Miss Hyman could have occurred in September or October; no evidence was offered

by defense to dispute this possibility nor was any proof offered tending to substantiate defendant's view that the parties first met in October and had intercourse in November. Stipulated testimony by a witness for the defense only showed that Prince and Miss Hyman were seen together at a club in October; that witness was unable to say whether or not that occasion was the first meeting of the parties. Medical evidence presented by defense pertained only to the possible date of conception and defendant's alleged incapacity to impregnate a female. It did not establish the date of the parties first act of intercourse together.

■ The question of defendant's access to relatrix during the period conception occurred, must be resolved by the evidence presented. We state again that by law the unsubstantiated testimony of the mother in a paternity action is sufficient evidence, if believed, to establish the paternity of the putative father. Huntington v. Crowley, supra. On the other hand, it is clear that unsubstantiated denials by an alleged father will not defeat the sufficiency of the mother's testimony, nor are they, by themselves, sufficient evidence of non-paternity. Thus the issue of access in the instant case must turn on the credibility of Miss Hyman's testimony, specifically her view as to the inception of the sexual relationship and whether or not that date is compatible or reconcilable with medical evidence delimiting the period of time in which her illegitimate child was conceived.

Relatrix' uncertainty as to when she first had intercourse with defendant is perhaps explainable since the affair had continued over a period of several months, and Miss Hyman was testifying at trial as to an event which had occurred almost four years previously. Opposing counsel attempted to refresh her memory as to the dates involved. Although relatrix originally stated that she had sex with defendant "around September or October", she

did respond that when she first met Prince at a dance, she did not believe school had opened for the fall term (relatrix was then in the 11th grade). Shortly thereafter she acknowledged that school did open in September of 1967. Assuming she was accurate in recalling the first instance of intercourse with Prince as occurring two weeks thereafter, it is implicit from the testimony that her sexual relationship with defendant began sometime in September, 1967.

██ Could her son, born in May of 1968, have been conceived as a result of this liaison? Dr. Eric O'Neal testified at trial that Miss Hyman's child was neither premature nor postmature but rather a "term baby" within an accuracy of plus or minus two weeks in terms of normal gestation. The duration of pregnancy, or period of gestation, is the interval in days between the time of impregnation and the beginning of labor. A "term baby" is the result of a normal period of gestation of approximately nine calendar months—ten lunar months—or 280 days, according to the concensus of medical testimony judicially noticed by courts in the United States. Shatkin, Sidney B., Disputed Paternity Proceedings (4th ed. 1967), at 718-719. The 280-day rule is generally calculated from the cessation of the last menstruation. Shatkin, supra, at 719. In the instant case, Miss Hyman testified that her last menstrual period was in the middle of September. Using the normal duration figure prospectively, birth was likely in the middle of June—slightly more than two weeks after it actually occurred. The rule is not, however, hard and fast. As Dr. O'Neal testified, a normal child may be considered a term birth within plus or minus two weeks—a tolerance which under the circumstances of this case tends to point to the date in the first week in September as the probable time relatrix conceived.

53

■ The facts of this case, however, do not support a convincing application of the 280-day rule. The problem is caused by lack of certainty as to when exactly Miss Hyman had her last menstruation, as evidenced by conflicting and uncertain testimony at trial.[1] For that reason, the court is compelled to look more closely at other evidence in point offered at trial, independent of the question of menstruation yet pertinent to and more persuasive on the issue of conception. That evidence concerns an examination Dr. O'Neal made of relatrix on March 8, 1968, which took place, according to Miss Hyman, a month or so after she realized she was pregnant. An obstetrician, Dr. Peter A. Curreri, testifying for the prosecution, reviewed the notes and measurements made by Dr. O'Neal and stated at trial that Miss Hyman was "by and large" 4 1/2 to 5 months pregnant at the time of the examination. Extrapolating that estimate backwards, Miss Hyman would have conceived between the first and last week of October, 1967. We find that possibility, however, difficult to reconcile with the birth of relatrix' mature baby, 7 to 7 1/2 months later. Using Dr. Curreri's estimate, the expected normal birth date would have been in July (8-22 July). No evidence was offered by the prosecution showing that the child was premature.

The defense let Dr. O'Neal testify as to his own examination. According to the doctor, the results indicated that Miss Hyman was six months pregnant at the time. Six months prior to the examination in question would place the date of conception in the first to second week in

[1] Miss Hyman testified on cross examination that she had her menstrual period in September 1967 (T-46). On recross examination she stated she missed her period "around October, September–October" (T-58). Dr. Peter A. Curreri, testifying from notes made by Dr. O'Neal during a medical examination of relatrix on March 8, 1968, stated that the notes indicated that her last period was in October, although the notation was followed by a question mark. Dr. O'Neal testified that he considered Miss Hyman six months pregnant by his measurements, even though relatrix had told him she had her last period in October. (T-195)

September. Based on Dr. O'Neal's estimate, which he confirmed in a subsequent examination of relatrix on May 10, 1968, the expected birth date of the child was June 8, 1968. Using Dr. O'Neal's plus or minus two week error factor, the expected birth date and the child's actual birth on May 27th, conception would appear to have been possible as late as mid-September—a result not far different from that obtained by applying the 280-day rule on the assumption Miss Hyman's last period occurred in the middle of September.

Admittedly, again, there is apparently considerable imprecision inherent in the methodology of determining a date of conception. Exact accuracy in this case is not as important as to the inception of the relationship, or whether they exclude the possibility of defendant's paternity. We do not find from the evidence presented, that Prince's alleged paternity is excluded by inconsistencies or contradictions between the estimates and Miss Hyman's testimony. Even defendant's own witness, Dr. O'Neal, gave implicit testimony that conception could have occurred in September, a month in which it is possible to deduce from the testimony of Miss Hyman that intercourse between the parties began. To draw fine lines between days, even weeks, is unjust and unrealistic under the circumstances of this case. Nor may we infer the possibility that relatrix had illicit relations with any one other than the putative father during the period in question, in the absence of a showing that the mother had a disposition to such relations and an opportunity to do so. Dastagir v. Dastagir, 241 P.2d 656, 109 C.A.2d 809. No evidence to this effect was presented in the instant case. As a matter of fact, Miss Hyman testified that she immediately informed Prince when she thought she was pregnant, and Prince gave her money to have it verified, an

action by the putative father at least somewhat inconsistent with a flat denial of paternity.

From the evidence, we hold that defendant did have sexual access to relatrix during at least a portion of the critical period where conception occurred.

## DEFENDANT'S FERTILITY

Through the testimony of Dr. O'Neal and a laboratory technician, Earl Henneman, the defense offered into evidence the results of several sperm counts that had been made over a four year period on Prince's spermatozoa in Lahmb Laboratories, a medical facility located in St. Thomas. These tests were made at the direction of Dr. O'Neal, and were initiated in February of 1965, after defendant had failed to conceive a child with his second wife. He admittedly fathered two children by his first wife, the last in 1963. According to Dr. O'Neal these tests were made in February, 1965; April, 1967; December, 1967; and, at the trial court's direction in the original trial, in January of 1969. The results of these tests showed sperm counts of under three million per cubic centimeter of seminal material, except for the last test where the count was stated to be three million, two hundred thousand. In each of these tests, Dr. O'Neal indicated that sperm motility, an attribute which is indicative of good quality and good fertilizing capacity, was poor (about 15% in each test). Dr. O'Neal also indicated that an average sperm count usually varies between 60–150 million per cubic centimeter. On the basis of this evidence, defense contended, that it was improbable if not impossible for Prince to have fathered Miss Hyman's child at any time between the first and last tests.

This medical testimony was introduced into evidence in the original trial, over prosecution's objection. The District Court on appeal held that the admission of this

56

evidence without a proper foundation was in error, and not a harmless error since the record disclosed that the trial judge was persuaded by it in making his finding of non-paternity. The District Court's specific objections to this evidence as presented in the original trial are viewed below in light of the subsequent presentation on retrial. The headings refer to the objection by the District Court, the discussion following is based on the evidence presented at retrial.

1. Admission was in error, since Dr. O'Neal did not personally make the tests in question, nor were they made in his presence nor under his direction.

Earl Henneman, employed at Lahmb Laboratory testified on retrial that he was a qualified technician, experienced in testing for infertility, and had supervised each of the defendant's sperm counts at Dr. O'Neal's direction. Dr. O'Neal testified that it was standard practice in his profession for a physician to rely on test results of a licensed laboratory.

2. The defense made no showing of the circumstances of collection, amount collected, type of receptacle used for collection and preservation, or how much time elapsed between taking and testing.

Prince testified that he collected his own ejaculate in a glass jar for each test, being careful to deliver the specimen to the laboratory within a half hour of ejaculation, as directed by the Laboratory. In his cross-examination of Prince, the prosecution asked whether the six cubic centimeter discharge reportedly analyzed by the Laboratory was a normal discharge for the defendant. Prince replied that he thought it was.

3. Nothing offered to show specimen tested came from defendant Prince.

█ Since ejaculation did not occur in the laboratory, defendant's testimony is supported only to the extent that

the specimen was presented by Prince to Henneman at the laboratory. The evidence may minimally meet the objections of the District Court, sufficient to pass the threshold of admission, but we find it far from persuasive as establishing defendant's non-paternity. Infertility does not mean sterility unless repeated semen examination shows no spermatozoa whatever. See Charny, Charles W., "Teste-Endotrine Aspects, Physiology and Spermatogenesis" in Traumatic Medicine and Surgery, Genito-Urinary Obstetrics and Gynecology, Volume 3, Butterworth Series, at 640.

Even if all fertility factors are generally deficient (the concentration of semen reduced, the motility depressed, and the number of abdominal spermatozoa increased), fatherhood for an infertile male is still possible, although unlikely. Charny, supra, at 646.

In a close case, only a mere possibility however improbable, of fatherhood, might well, and often does, tip the scales in terms of a preponderance of the evidence in favor of the putative father, resulting in a finding of non-paternity. See Potasz v. Potasz, 155 P.2d 895, 68 Cal. App. 2d 20 (finding of non-paternity was made on the basis of expert testimony that court was extremely doubtful that defendant therein could have impregnated a female during the period in question). But our research reveals that the mere presentation of a scientific defense to prove the improbability of paternity will not be successful unless the court is satisfied that the tests made and procedures followed were thorough and carefully, if not rigidly, controlled. The defense is viewed by a particularly wary judicial eye if the circumstances of the case, like those before us now, indicate that the putative father formerly had children, was having a continuing sexual relationship with the mother and conception could

have occurred during the affair, as we have so found in the instant case.

After reviewing the scientific evidence as presented we are unable to conclude that Prince's examinations were either thorough or carefully controlled. Dr. O'Neal recommended laboratory sperm count analysis for Prince, but no evidence was submitted showing the results of any physical exam performed on defendant. Dr. O'Neal testified he was merely continuing the tests and treatment (hormone shots) which were initiated by another doctor. There was no indication of Prince's nutritional status, habits, general development, or conditions of his genital or endocrine systems. Such tests or inquiries may not discover the cause of infertility, but it is medically recognized that the ability to produce spermatozoa may be affected by such conditions or practices as malnutrition, drug reactions, active viral or bacterial infections, chronic diseases, endocrine or genital disturbances, too frequent sexual activity, poor general hygiene, excessive use of tobacco, alcohol, sedentary habits and chronic constipation, among others. See Charny, Walter B. & Peete, Ches. H. "Infertility" in Traumatic Medicine & Surgery, Genito-Urinary Obstetrics and Gynecology, Volume 9, Butterworth Series, at 503 and 507. Of this myriad of causative explanations or theories not one was offered into evidence as the reason or possible reason for Prince's deficient spermatogenic function. Causative analysis is important for Prince's defense in this case not so much in identifying the source or sources of his problem as it is in excluding factors that are capable of fluctuating. Defendant's spermatozoa may well have been inadequate in terms of motility, character and number, at the time of the tests. But variable factors, some of which may well be voluntary, raise a serious doubt in the court's mind as to whether defendant's depressed spermagenic condition could

59

be presumed to be static in the intervals between laboratory sperm counts—particularly during the period of his relationship with Miss Hyman. In the absence of more concrete evidence, we cannot presume a chronically stable condition from the mere similarity of sperm count levels as revealed in the test results.

Our doubt in this regard, and in regard to the thoroughness of the Prince's medical evaluation, is reinforced by testimony at trial. As the prosecution pointed out, of the various procedures routinely performed in order to exclude the various beforementioned factors, there was evidence that only blood and sperm counts were utilized. Other routinely required procedures, including urinalysis, serology, examination of a staid prostatic smear, and thyroid function tests, among others, were never done. Dr. O'Neal acknowledged the absence of some of these tests, stating all of them were never performed on a single patient "in actual practice". Certain tests were apparently contraindicated by defendant's condition. Thus, circuitously, the court is led again to ponder the causative nature and stability of Prince's alleged infertility. Diagnostic evidence presented by the defense was not sufficient to resolve our doubts on this point.

We are even more dubious as to the weight to be accorded the sperm count findings in light of the procedures and techniques followed and applied by Lahmb Laboratories and defendant himself. According to the only expert treatises referred to at trial (by the prosecution) seminal evaluation is most satisfactory if performed after a suitable period of abstinence usually 4–7 days, from sexual activity, and that the specimen must be fresh. Evidence of abstinence prior to instances of laboratory analysis is lacking in the instant case. Defendant testified he couldn't remember whether or not he was told to abstain.

Was the specimen fresh in the instant case? We have only defendant's testimony that he complied with the laboratory's request each time to bring in specimens within one half hour of ejaculation. There was no evidence offered to show in the instant case whether or not delays in bringing a specimen are detectable in the process of examination, yet it was acknowledged at trial that timing was extremely important since sperm motility decreases steadily from the moment of ejaculation. Even under observed and controlled laboratory conditions, only about 10% of a *normal* sperm sample remain active after the passage of 24 hours. Charny, supra, at 645.

In this regard, a sterile collection process and receptacle would seem to be critical. Prince brought in his specimen in a glass jar which he washed out and cleaned, to the best of his recollection, although he couldn't recall being told to do so by the laboratory. Dr. O'Neal testified initially that a condum is a method of collection usually employed, although he later admitted in response to a question asked by the prosecution that condums sometimes contain chemicals which are destructive to spermatozoa. The doctor stated, however, that the collection was directed by the laboratory without his advice. Whether condums or glass jars were used by Prince to collect his sperm, the court finds implicit in the circumstances of the described collection processes that a less than certain degree of care and thoroughness was exercised in relation to the importance of providing a sterile container.

Questions concerning abstinence as it affects volume, the delay between collection and analysis, and the appropriateness of the collection process and receptacle, might have had less significance if the specimens examined showed high levels of structural abnormalities. Fertility is considered "definitely depressed" if more than 40% of the spermatozoa are abnormally shaped. Charny, supra,

at 645. However, Mr. Henneman testified that Lahmb Laboratories performs only sperm counts; no tests were apparently made to determine the morphology of the spermatozoa in defendant's specimens.

■ The court is mindful of the fact that Prince was not shown to be sterile, and that no matter how improbable impregnation would seem to be in light of defendant's sperm counts, it was still possible as long as Prince had some viable sperm. When this possibility is coupled with the manner in which defendant and his sperm were analyzed and evaluated, as we have indicated above, and the fact that Prince did have prior children, the defense as presented has precariously little weight. When it is viewed in light of the other facts in this case, including our finding that defendant had access to the relatrix during at least a portion of the critical period where conception occurred and thereafter engaged in a sexual relationship for some duration with Miss Hyman, the defense fails.

We find no reason to disbelieve the testimony of Miss Hyman. On the basis of the preponderance of the evidence in this case, we find that Evans Prince is the father of the child born to Delores Hyman on May 27, 1968.