**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

T. JEFFREY SIMPSON, on behalf of
himself and all others similarly
situated,
                              *Plaintiff,*

            and

CALIFORNIA STATE TEACHERS
RETIREMENT SYSTEM,
                *Plaintiff-Appellant,*

            v.

AOL TIME WARNER INC.; CENDANT
CORPORATION; RICHARD A. SMITH;
L90, aka Max Worldwide; DAVID
COLBURN; ERIC KELLER,
                *Defendants-Appellees.*

No. 04-55665

D.C. No.
CV-01-11115-MJP

OPINION

Appeal from the United States District Court
for the Central District of California
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
February 6, 2006—Pasadena, California

Filed June 30, 2006

Before: Robert R. Beezer, Thomas G. Nelson, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

7233

## COUNSEL

Joseph W. Cotchett (argued) and Nancy L. Fineman, Cotchett, Pitre, Simon & McCarthy, Burlingame, California, for plaintiff-appellant California State Teachers' Retirement System.

Peter T. Barbur (argued), Cravath, Swaine & Moore LLP, New York, New York; John B. Quinn, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, California, for defendant-appellee Time Warner Inc. Samuel Kadet, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Jeffrey Speiser, Stern & Kilcullen, Roseland, New Jersey, for defendants-appellees Cendant Corporation and Richard A. Smith. Carl S. Kravitz, Zuckerman Spaeder LLP, Washington, DC, for defendant-appellee David Colburn. J. Christian Word, Latham & Watkins LLP, Washington, DC, for defendant-appellee Eric Keller. Daniel J. Tyukody, Orrick, Herrington & Sutcliffe LLP, Los Angeles, California, for defendant-appellee L90, Inc. d/b/a MaxWorldwide, Inc.

Michael L. Post, Senior Counsel, Washington, DC, on behalf of the Securities and Exchange Commission as amicus curiae in support of appellant. Peter H. Mixon, General Counsel, Sacramento, California; Keith Johnson, Chief Legal Counsel, Madison, Wisconsin, on behalf of the California Public Employees' Retirement System and the State of Wisconsin Investment Board as amici curiae in support of appellant. Eric Alan Isaacson, Lerach Coughlin Stoia & Robbins LLP, San Diego, California, on behalf of the Regents of the University of California as amicus curiae in support of appellant. Lawrence S. Robbins, Robbins, Russell, Englert, Orseck & Unter-

einer LLP, Washington, DC, on behalf of the American Institute of Certified Public Accountants as amicus curiae in support of appellees. David H. Braff, Sullivan & Cromwell LLP, New York, New York, on behalf of the Bond Market Association, et al., as amici curiae in support of appellees.

## OPINION

GOULD, Circuit Judge:

This consolidated class action litigation alleges that multiple actors engaged in a scheme to commit securities fraud by overstating the reported revenues of an Internet company, Homestore.com ("Homestore"). Homestore eventually restated its revenues, resulting in a decrease in revenues of more than $170 million and corresponding declines in Homestore's stock value. The district court dismissed the securities claims against Defendants-Appellees, relying on the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

In this appeal, the lead plaintiff, California State Teachers' Retirement System ("CalSTRS" or "Plaintiff"), seeks to reverse the district court's dismissal with prejudice of its claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), against six outside defendants ("Defendants"): AOL Time Warner ("AOL") and two of its officers, Eric Keller and David Colburn; Cendant Corporation and one of its officers, Richard Smith; and L90, Inc. ("L90"). Plaintiff alleges Homestore entered into fraudulent transactions with these Defendants in which Homestore purchased revenue for itself and then recorded that revenue in violation of SEC accounting rules. In the alleged "triangular transactions," Homestore entered into sham transactions with "Third Party Vendors" who then returned the money to Homestore through contracts with AOL or L90. Plaintiff alleges Home-

store overpaid for an asset owned by Cendant in return for Cendant's agreement that it would funnel some of the money back to Homestore through a related business entity. The complaint further alleged that the recording of gross revenue from these transactions contravened SEC rules regarding barter transactions or the buying of revenue, and that the triangular transactions were often done without the full knowledge of Homestore's auditor.

The Supreme Court held in *Central Bank* that § 10(b) does not allow recovery for aiding and abetting liability, *Cent. Bank*, 511 U.S. at 177-78, but cautioned that secondary actors were not always free from liability under § 10(b) because they may still be liable as a primary violator. 511 U.S. at 191. We address here the scope of primary violation liability that the Supreme Court did not fully define in *Central Bank*.

Plaintiff asserts that Defendants are primary violators under § 10(b) for engaging in a "scheme to defraud." In response, Defendants argue that the Supreme Court in *Central Bank* limited primary liability under § 10(b) to defendants who personally made a public misstatement, violated a duty to disclose or engaged in manipulative trading activity, and not to those engaged in a broader scheme to defraud. Although we hold that the scope of § 10(b) includes deceptive conduct in furtherance of a "scheme to defraud," when all elements of § 10(b) are otherwise satisfied, we conclude that Plaintiff's complaint insufficiently alleged that Defendants were primary violators of § 10(b) based on their conduct in the furtherance of the scheme.

# I

CalSTRS alleges in its First Amended Consolidated Complaint ("FACC") that Homestore and its officers, along with its auditor PriceWaterhouseCoopers ("PWC"), AOL, Cendant, L90, and additional Third Party Vendors, committed securities fraud by engaging in round-trip or barter transac-

tions whereby Homestore recorded net revenues from its receipt of monies that came from Homestore's own cash reserves.

Homestore created an online real estate website in 1996. In the late 1990s, there was an explosion of Internet start-up companies which consistently posted net losses and negative cash flows as those companies sought to develop leadership and market share in their industries. This development caused a corresponding shift in emphasis by financial analysts to the tracking and evaluation of revenues as an indicator of future earnings. Until 2001, Homestore was perceived as an Internet company that consistently matched or exceeded its estimated revenue goals. To meet its revenue expectations, Homestore relied increasingly on barter or round-trip transactions with other companies. In such transactions, Homestore paid a company, the company returned part of the money to Homestore by way of a different transaction, and Homestore recorded these returned funds as revenue.

Internet companies have historically engaged in barter transactions between themselves, often in order to place advertising on each other's websites. Beginning in fiscal year 2000, the SEC implemented a new accounting standard that required companies engaging in barter transactions to report only the net revenue that was earned from these related transactions, rather than the gross revenue received. Facing increasing scrutiny from its auditor PWC, Homestore's barter transactions grew more complex. Homestore engaged in triangular transactions, with the result that PWC did not recognize that the revenue that Homestore recorded was related to a prior transaction funded by Homestore. As the district court succinctly summarized, in these triangular transactions:

> Homestore would find some third party corporation, one that was thinly capitalized and in search of revenues in order to "go public." Homestore then agreed to purchase shares in that company for inflated val-

ues or to purchase services or products that Home-
store did not need. This transaction was contingent
on the third party company "agreeing" to buy adver-
tising from AOL for most or all of what Homestore
was paying them. The money thus flowed through
the third party to AOL, which then took a commis-
sion and shared "revenue" with Homestore.

*In re Homestore.com, Inc. Securities Litigation*, 252 F. Supp.
2d 1018, 1023 (C.D. Cal. 2003). Against this background, we
consider the allegations against the particular Defendants.

## A.   Allegations Involving AOL, and its officers Keller and Colburn

The history of Homestore and AOL for purposes of this
appeal began with the creation of a legitimate partnership in
April 1998, whereby Homestore purchased the "exclusive
right to have the only online real estate listing product on
AOL." In a second legitimate deal with AOL, Homestore
entered into an advertising reseller agreement, under which
AOL agreed in March 1999 to sell advertising on the Home-
store website and retain a commission.

The triangular transactions at issue here occurred during the
first two quarters of fiscal year 2001. Plaintiff alleges that
Homestore entered into a series of sham transactions with var-
ious Third Party Vendors for some product or service that
Homestore did not need. The Third Party Vendors would then
contract with AOL for advertising on Homestore's website
and AOL would give this money back to Homestore under
their advertising reseller agreement. Both the Third Party
Vendors and AOL would keep a portion of the money as a
commission. Plaintiff only alleges that the first leg of the
transaction was truly a sham because nothing of value was
given in exchange for Homestore's payment. AOL continued
to sell advertising on Homestore's website to Third Party

Vendors, withholding commissions before passing the Vendors' payments on to Homestore.

Plaintiff alleges that Defendant Eric Keller, as an employee of AOL, jointly developed these transactions with Homestore. Keller was also alleged to have contacted some of the Third Party Vendors that took part in these triangular transactions. Plaintiff alleges, without detailed support, that Defendant Colburn, Keller's supervisor, approved the improper transactions. AOL placed Keller on administrative leave in June 2001. AOL then attempted to include more accurate documentation of the round trip nature of additional triangular transactions that occurred at the close of the second quarter of 2001. Homestore convinced AOL to accept less descriptive documents, which would not alert PWC to the nature of the round-trip transaction. AOL included a list of the "potential referral advertisers" as part of the second deal in 2001, but let Homestore add other companies not involved in the round-trip transactions so that the Third Party Vendors could not be identified.

## B.    Allegations Involving Cendant and its officer Smith

Cendant Corporation is a conglomerate with holdings in real estate, travel, and vehicle rentals. In 2001, it owned Move.com, the second largest real estate internet website after Homestore. Cendant sold Move.com to Homestore in the first quarter of 2001. In exchange for the site, Homestore transferred $750 million worth of Homestore stock to Cendant and placed Cendant's president, Richard Smith, on Homestore's board of directors. Plaintiff alleges that, although an outside firm appraised the site, Homestore "grossly overpaid" Cendant for this website, which Cendant considered a "bad asset."

Plaintiff alleges that the Move.com transaction was contingent on a promise by Cendant to recycle some of Homestore's payment for Move.com back to Homestore. To accomplish this, Cendant set up a separate corporate entity, the Real

Estate Technology Trust ("RETT"), and funded it with $95 million. Cendant, through RETT, then agreed to the payment of $80 million over two years in exchange for products and services from Homestore. There are no allegations that Cendant made efforts to conceal the contingent nature of these transactions.

According to the allegations in the FACC, Cendant later agreed to use the remaining $15 million in RETT to purchase virtual tours from Homestore. At first, Cendant proposed a reciprocal agreement in which Homestore would purchase $15 million in products from Cendant at a later date. Homestore refused because this reciprocal transaction would prevent PWC from allowing Homestore to report the first $15 million as revenue. Cendant then dropped the reciprocal requirement and purchased the tours.

## C. Allegations Involving L90

L90 entered into triangular transactions with Homestore and various third parties during the second and third quarters of 2001. These transactions followed the business model created with AOL's participation.[1] At the end of the third quarter of 2001, PWC required a confirmation letter from L90 before it would certify Homestore's 10-Q filing. Initially, Mark Roah, a corporate officer for L90, refused to sign the confirmation letter. Fearing personal liability, Roah requested payment from Homestore and said that he wanted only to do "legitimate deals" with the company. Roah later dropped his demands and confirmed the revenue, but shortly thereafter Homestore's Chief Financial Officer Joseph Shew refused to sign the Form 10-Q report that included the revenues Roah had confirmed. Homestore then announced that it would restate its financial results to reflect lower revenue.

---

[1]There are no allegations that L90 or its officers helped to develop these transactions such as Keller was alleged to have done.

### D.  Procedural History

Multiple class action complaints were filed between December 27, 2001, and February 13, 2002. These complaints were consolidated on February 22, 2002. On September 25, 2002, Homestore's former Chief Operating Officer, John Giesecke; former Chief Financial Officer, Joseph Shew; and Vice President of Finance, John DeSimone, pled guilty to securities fraud violations. On November 15, 2002, Plaintiff filed the FACC, which relied on the details recited in the plea agreements for these officers. Homestore and Peter Tafeen, former Executive Vice President of Business Development and Sales, answered the FACC, but all other defendants moved to dismiss. On March 7, 2003, the district court denied the motions to dismiss for Stuart Wolff, Homestore's former CEO, and its auditor PWC. The district court dismissed without prejudice the complaint as to the remaining Homestore insider defendants. Relevant to this appeal, the district court also dismissed the complaint as to the outside defendants with prejudice.

In dismissing the complaint against the outside defendants, which it referred to as the "Business Partner Defendants," the district court observed that in previous cases in which courts found primary liability, a special relationship existed between the defendants and the shareholders. The district court ultimately determined that the outside defendants did not commit a primary violation because they only facilitated and participated in Homestore's fraud. The district court also determined that Plaintiff had not demonstrated reliance because the shareholders did not rely on the outside defendants' scheme but only on the statements made about the scheme by Homestore.

## II

We review de novo the dismissal of claims pursuant to Federal Rule of Civil Procedure 12(b)(6). *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). We may affirm a dismissal on any basis fairly supported by the record,

even if the district court did not reach the issue or relied on different grounds or reasoning. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). "All allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Id.* (internal quotations omitted). "Dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Id.* "The district court's dismissal of a complaint without leave to amend is reviewed de novo and is improper unless it is clear that the complaint could not be saved by any amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Securities fraud must be pled with specificity. In the Private Securities Litigation Reform Act ("PSLRA"), Congress required that "a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1034 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(1)). In addition, all allegations of deceptive conduct are generally subject to Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud or mistake shall be stated with particularity."

## III

We determine whether the Defendants' conduct, as alleged, is a primary violation of § 10(b). Section 10(b) prohibits, in pertinent part, "any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe." Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b). To implement § 10(b), the SEC promulgated Rule 10b-5, 17 CFR § 240.10b-5. Rule 10b-5 is composed of three parts that describe the type of conduct prohibited by § 10(b). The second part proscribes the making of "any untrue statement of a material fact" or the omission of any material fact that is necessary in order to make the statements made not misleading. Rule 10b-5(b), 17 CFR § 240.10b-5(b). The first and third parts make it unlawful for any person "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Rule 10b-5(a) & (c), 17 CFR § 240.10b-5(a) & (c).

Liability under Rule 10b-5 does not extend beyond the limits of § 10(b). *See Cent. Bank*, 511 U.S. at 173 ("But the private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)."); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976) ("Thus, despite the broad view of the Rule advanced by the Commission in this case, its scope cannot exceed the power granted the Commission by Congress under § 10(b)."). In *Central Bank*, the Supreme Court held "that the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation." 511 U.S. at 177; *see also id.* at 177-78 ("We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute."). The Court cautioned, however, that secondary actors, other than the securities issuer, may be liable as primary violators under § 10(b) when all elements of the statute are satisfied:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipu-

lative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

*Cent. Bank*, 511 U.S. at 191.

A private action under § 10(b) and Rule 10b-5 must allege and prove all of the elements for primary liability for each defendant. The elements of a securities fraud claim are: (1) to use or employ any manipulative or deceptive device or contrivance; (2) scienter, *i.e.* wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases as "transaction causation;" (5) economic loss; and (6) loss causation, *i.e.* a causal connection between the manipulative or deceptive device or contrivance and the loss. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

The district court and the parties have questioned the sufficiency of the allegations concerning three elements: (1) the use or employment of a deceptive device or contrivance by the Defendants; (2) in connection with the purchase or sale of securities; (3) that has been relied upon by the public.[2]

## A.    The Use or Employment of a Deceptive Device or Contrivance

**[1]** The Supreme Court tells us that § 10(b) is intended to prohibit the use or employment of any deceptive device in

[2]We do not consider the possibility of liability based on actionable omissions or manipulation sufficient to satisfy the requirement of a "manipulative or deceptive device or contrivance" under § 10(b). There are no allegations that any Defendant was subject to a duty to disclose in the context of these transactions or engaged in manipulative trading activity. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

connection with the purchase or sale of securities, including deception as part of a larger scheme to defraud the securities market. *See Ernst & Ernst*, 425 U.S. at 199 n.20 (defining "device" as "an invention; project; scheme; often, a scheme to deceive"); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7 (1971) (" 'We believe that § 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.' " (quoting *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967))). The Supreme Court has also held that a non-speaking actor who engages in a "scheme to defraud" has used or employed a deceptive device within the meaning of § 10(b). *See SEC v. Zandford*, 535 U.S. 813, 821-22 (2002).

**[2]** In *Central Bank*, the Supreme Court held that liability under § 10(b) only extends to "primary violators" and there is no liability for merely "aiding and abetting" a violation. 511 U.S. at 191. Since *Central Bank*, it is the duty of courts to determine what constitutes a "primary violation" of § 10(b). With respect to the making of false statements or omissions, we have held that "substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000); *see id.* at 1061 (holding that signing and attesting to a statement, such that for all intents and purposes the signor-attestor made the statement, is sufficient to be considered a primary violator); *see also In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628-29 & n. 3 (9th Cir. 1994) (holding that drafting or editing false statements that the drafter-editor knows will be publicly disseminated is sufficient to be considered a primary violator).

**[3]** What it means to be a "primary violator" with respect to an alleged "scheme to defraud" has been less extensively

discussed. In *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997), we held that to be liable for a "scheme to defraud," "each defendant [must have] committed a manipulative or deceptive act in furtherance of the scheme." The relevant inquiry is: what conduct constitutes a manipulative or deceptive act in the furtherance of a scheme to defraud sufficient to render the defendant a "primary violator" of § 10(b)?

**[4]** The SEC argues in its amicus brief that "Any person who directly or indirectly engages in a manipulative or deceptive act as part of a scheme to defraud can be a primary violator."[3] The SEC defines "a deceptive act" as "engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues." We agree with the SEC that engaging in a transaction, the principal purpose and effect of which is to create the false appearance of fact, constitutes a "deceptive act."[4] Participation in a fraudulent transaction by itself, however, is insufficient to qualify the defendant as a "primary violator" if the deceptive nature of the transaction or scheme was not an intended result, at least in part, of the defendant's own conduct. We hold that to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact

---

[3]The arguments of the SEC are only persuasive authority to the extent that they are reasonable in light of the statutory authority. *See Zandford*, 535 U.S. at 819-20 ("[The SEC's] interpretation of the ambiguous text of § 10(b), in the context of formal adjudication, is entitled to deference if it is reasonable"). To the extent that the SEC's proposed test purports to include aiding and abetting or coconspirator liability, we are constrained to reject it. *See In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995).

[4]"The consideration of purpose and effect of challenged actions not infrequently assists in determining whether a prohibition is to be applied to complex conduct. . . . [and its] importance . . . [in] judg[ing] the legality of challenged action is also a recurring theme in statutory law." *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1064 (9th Cir. 2003).

in furtherance of the scheme. It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect.[5]

Defendants argue that imposing liability for participation in an overall scheme to defraud would impose liability for conduct other than the making of a material misstatement or omission and would conflict with *Central Bank*. We disagree. We see no justification to limit liability under § 10(b) to only those who draft or edit the statements released to the public. To the contrary, § 10(b) prohibits any person or entity from

---

[5]The "principal purpose" prong is related to but different from the element of scienter. For the element of scienter, we require "that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). Previous cases have found the scienter requirement satisfied by indirect evidence of a culpable state of mind, such as suspicious insider trading activity or knowledge of accounting violations. *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005); *Silicon Graphics*, 183 F.3d at 986. While the scienter element ensures a culpable state of mind and must be satisfied for recovery under § 10(b), the "principal purpose" prong examines instead whether the challenged conduct of the defendant had a principal purpose, and not just an accidental effect, of creating a false appearance as part of a deceptive transaction or fraudulent scheme. Unlike the scienter requirement, the "purpose and effect" test is focused on differentiating conduct that may form the basis of a primary violation under § 10(b) from mere aiding and abetting activity that the Supreme Court has held does not constitute a primary violation. A defendant may intend to deceive the public by substantially assisting another's misconduct as part of a scheme to defraud, but fail to perform personally any action that created a false appearance as part of this scheme. The scienter requirement, therefore, will not in all cases distinguish aiding and abetting from primary liability. In applying the "scienter" element, we look at whether a defendant's state of mind was sufficiently culpable for § 10(b) liability. By contrast, we may examine the "principal purpose and effect" of the defendant's challenged conduct in a fraudulent scheme as an aid to assessing whether the defendant's conduct was sufficiently deceptive for § 10(b) liability.

using or employing any deceptive device, directly or indirectly, in connection with the purchase and sale of securities. *See* Robert A. Prentice, *Locating That "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability under Section 10(b)*, 75 N.C. L. Rev. 691, 731 (1997) (asserting that "the view that one can be liable only for one's own statements arguably ignores the fact that both Section 10(b) and Rule 10b-5 condemn those who employ devices or make misstatements 'directly or indirectly' "). Furthermore, § 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford*, 535 U.S. at 819 (internal quotation marks omitted). Nor is "scheme to defraud" liability a substitute for aiding and abetting liability that the Supreme Court precludes in *Central Bank*. The focus of the inquiry on the deceptive nature of the defendant's own conduct ensures that only primary violators (that is, only those defendants who use or employ a manipulative or deceptive device) are held liable under the Act.

Trial courts which have imposed liability under a "scheme to defraud" theory have often required that the defendant's actions in fraudulent transactions have a principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud. *See Quaak v. Dexia S.A.*, 357 F. Supp. 2d 330, 342 (D. Mass. 2005) (finding sufficient allegations for primary liability under § 10(b) when "defendant was a primary architect of the scheme to finance the sham entities"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-337 (S.D.N.Y. 2004) (allowing claims of primary liability to go forward where auditors "masterminded" company's misleading accounting practices); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003) (denying a motion to dismiss for outside business partners who invented sham corporate entities that allowed a corporation "to hide research and development expenses, create fictitious revenue, and ultimately overstate profits in [its] financial reports").

**[5]** Conduct by the defendant that does not have a principal legitimate business purpose, such as the invention of sham corporate entities to misrepresent the flow of income, may have a principal purpose of creating a false appearance. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819, 830 (S.D. Tex. 2004) ("Sham business transactions with no legitimate business purpose that are actually guaranteed 'loans' employed to inflate Enron['s] financial image are not above-board business practices."). Conduct that is consistent with the defendants' normal course of business would not typically be considered to have the purpose and effect of creating a misrepresentation. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002) (finding that "conclusory allegations that are consistent with the normal activity of such a business entity, standing alone, . . . are insufficient to state a claim of primary liability under *Central Bank*" (internal quotation marks omitted)). Participation in a legitimate transaction, which does not have a deceptive purpose or effect, would not allow for a primary violation even if the defendant knew or intended that another party would manipulate the transaction to effectuate a fraud. *See In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006) (refusing to impose primary liability "on a business that entered into an arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts"); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) ("At worst, the banks designed and entered into the transactions knowing or even intending that Parmalat or its auditors would misrepresent the nature of the arrangements. That is, they substantially assisted fraud with culpable knowledge — in other words, they aided and abetted it.").

**[6]** If a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device

within the meaning of § 10(b). A test that examines the purpose and effect of a defendant's conduct in an alleged scheme to defraud, as a means to assess whether the defendant used or employed a deceptive device, ensures that the defendant's conduct is sufficiently deceptive to justify imposing primary liability. Thus, when determining whether a defendant is a "primary violator," the conduct of each defendant, while evaluated in its context, must be viewed alone for whether it had the purpose and effect of creating a false appearance of fact in the furtherance of an overall scheme to defraud.

## B.   In Connection with the Purchase or Sale of Securities

[7] In addition to the use or employment of a deceptive or manipulative device or contrivance, § 10(b) requires that the primary violation must be "in connection with the purchase or sale of any security." 15 U.S.C. § 78j. In *Zandford*, the Supreme Court held that a broker's misappropriation of a brokerage account was a fraudulent "scheme to defraud" that was "in connection with" the sale of securities despite lacking any deception about the value of a security or "manipulation of a particular security." *Zandford*, 535 U.S. at 821. In *Zandford*, the broker fraudulently wrote checks to himself from a brokerage account that required the sale of securities in order to cash the checks. *See id.* Although the misappropriation of money did not affect the securities market until the check was later redeemed, the broker's scheme to defraud was not complete until the victim's securities were sold and the check was redeemed. *See id.* The Supreme Court held that the scheme to defraud "coincided" with the sale of securities, which satisfied the "in connection with" requirement of § 10(b). *Id.* at 820.

[8] Similarly, a scheme to misrepresent the publicly reported revenue of a company may coincide with the purchase or sale of securities because the scheme will not be complete until the fraudulent information is introduced into the securities market. That every participant in the scheme did

not release the information to the public does not diminish the causal connection between all defendants in the scheme and the securities market. *See Cent. Bank*, 511 U.S. at 191 (stating that "[i]n any complex securities fraud, moreover, there are likely to be multiple violators"). If multiple participants used or employed a deceptive device in furtherance of a scheme to misrepresent the reported revenues of a company, then all participants may be viewed as having acted in connection with the purchase or sale of securities.

## C.  Reliance

**[9]** Another requirement for liability under § 10(b) is reliance. *See Cent. Bank*, 511 U.S. at 180. "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). A plaintiff may be presumed to have relied on a misrepresentation if the misleading or false information was injected into an efficient market. "Indeed, nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 247. The fraud-on-the-market presumption requires the dissemination of the misrepresentation into an efficient market, but not personal involvement by the defendant in disseminating this statement. *See Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1436 (9th Cir. 1996) ("Because a material misrepresentation or omission is generally embedded in the market price of the security, an investor who purchases or sells the security will have presumably relied on the misrepresentation.").

The requirement of reliance is satisfied if the introduction of misleading statements into the securities market was the intended end result of a scheme to misrepresent revenue. *See In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 973 (C.D. Cal. 1994) ("Instead, the market's overall reliance on the Z Best

fraudulent scheme, or at least the additional statements as released and issued by Z Best, is sufficient to satisfy the reliance element in the Rule 10b-5(a) & (c) claims."); *see also* 4 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg & Lowenfels on Securities Fraud* § 7:469 (2d ed. 2006) ("Despite some earlier disagreement, it now seems settled that FOMT [the fraud-on-the-market-theory] applies to all three clauses of Rule 10b-5: (1) scheme to defraud, (2) misrepresentation or omission, and (3) fraudulent course of business, not just to clauses (1) and (3)."). The scheme to defraud would not be complete until the fraudulent information has entered the securities market. *See Parmalat*, 376 F. Supp. 2d at 509 ("The banks made no relevant misrepresentations to those markets, but they knew that the very purpose of certain of their transactions was to allow Parmalat to make such misrepresentations. In these circumstances, both the banks and Parmalat are alleged causes of the losses in question."). We may presume, absent persuasive conflicting evidence, that purchasers relied on misstatements produced by a defendant as part of a scheme to defraud, even if the defendant did not publish or release the misrepresentations directly to the securities market.

We conclude that conduct by a defendant that had the principal purpose and effect of creating a false appearance in deceptive transactions as part of a scheme to defraud is conduct that uses or employs a deceptive device within the meaning of § 10(b). Furthermore, such conduct may be in connection with the purchase or sale of securities if it is part of a scheme to misrepresent public financial information where the scheme is not complete until the misleading information is disseminated into the securities market. Finally, a plaintiff may be presumed to have relied on this scheme to defraud if a misrepresentation, which necessarily resulted from the scheme and the defendant's conduct therein, was disseminated into an efficient market and was reflected in the market price.

**IV**

With these principles in mind, we address the adequacy of the allegations of the FACC at issue here. If the Defendants' conduct, as alleged in the FACC, had the purpose and effect of creating a false appearance from illegitimate transactions in furtherance of a scheme to misrepresent revenues, then Plaintiff has alleged a primary violation of § 10(b). If the relevant actions by the Defendants were not deceptive, however, but only facilitated or assisted the fraudulent misreporting of legitimate transactions by Homestore, then Defendants were not primary violators under § 10(b) and this complaint was correctly dismissed.

## A. Primary Liability of America Online (AOL) and its officers

[10] AOL and its officers are alleged to have played a role in the scheme to overstate the revenues of Homestore. According to the FACC, Eric Keller, a Senior Vice President at AOL, helped Homestore to organize and create the triangular transactions. The FACC further alleges that the triangular transactions were necessary to allow Homestore to overstate its revenues, and that the actions of AOL, Colburn and Keller assisted Homestore in misrepresenting the revenues from these transactions. But primary liability requires more than assertions of "helping" or "assisting" another's deception. To allege a primary violation, the complaint must allege that AOL or its officers actually engaged in a deceptive act. We have examined the specific allegations involving AOL and its officers to determine whether the FACC alleges conduct by the AOL Defendants that had the purpose and effect of creating a false appearance in fraudulent transactions that were part of a scheme to defraud. We conclude that the allegations are insufficient.

[11] It is not alleged that AOL or its officers created sham business entities or engaged in deceptive conduct as part of

illegitimate transactions, and so we conclude that the element of using or employing a deceptive device is not adequately alleged in this respect. There is no indication from the FACC that the transactions engaged in by AOL were completely illegitimate or in themselves created a false appearance.[6] The substance of the allegations shows that AOL's role in the transactions was to act as a conduit for the flow of revenue between the Third Party Vendors and Homestore as an advertising agent, in accord with AOL's advertising reseller agreement with Homestore.

The FACC does allege that Homestore entered into sham transactions with "Third Party Vendors" in return for a "quid pro quo" obligation from these vendors to buy Homestore advertising from AOL. Assuming the truth of allegations that no products of value were exchanged between the Third Party Vendors and Homestore, the FACC nonetheless does not allege that AOL itself entered into a transaction that had no legitimate economic value or created a false appearance. While the advertising transactions between the Third Party Vendors and AOL are alleged to contain suspect qualities, such as exaggerated commissions by AOL, there is no suggestion that actual advertisements were not purchased and sold by these companies. The FACC does not allege that the transactions contained a false appearance or other deceptive qualities, but rather that they were an opportunity for Homestore to take advantage of the advertising reseller agreement. This may pin liability on Homestore, but not on AOL or its officers.

The FACC also alleges that AOL attempted to include additional documentation in subsequent transactions that would connect the referral agreements between Homestore

---

[6]Defendants urge that the challenged transactions were not deceptive, and that only the reporting of revenues from these transactions by Homestore, conduct in which Homestore was not assisted by the Defendants, deceived the investing public about revenues of Homestore.

and the Third Party Vendors with the advertising revenues from AOL. While the absence of this additional documentation allowed Homestore to misreport the revenues from the AOL advertising referrals as stand-alone transactions, any misrepresentation in the transactions involving AOL resulted from the additional agreements between Homestore and the Third Party Vendors and the misreporting of the income by Homestore. The transactions involving AOL did not create a false appearance until they were viewed in conjunction with Homestore's actions before and after the transaction. While AOL would be liable under § 10(b) for its deceptive conduct as part of a scheme to defraud if AOL engaged in deceptive conduct, it may not be held liable for participating in legitimate transactions that became "deceptive" only when distorted by the willful or intentional fraud of another party. *See Parmalat*, 376 F. Supp. 2d at 505 ("Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere."). In this case, the FACC does not allege with the required particularity that the transactions negotiated by Keller and performed by AOL created a false appearance.

**[12]** We conclude that the FACC failed to sufficiently allege with particularity that AOL committed actions with the purpose and effect of creating a false appearance in furtherance of a scheme to defraud.

## B.  Primary Liability of Cendant and its officer Smith

The FACC also alleges that Cendant participated in a scheme to defraud by engaging in triangular transactions. Cendant argues that the transactions were simply "simultaneously agreed upon business transactions" and were not deceptive or manipulative absent the application of improper accounting principles by Homestore.

**[13]** We agree that the FACC does not indicate how these transactions involving Cendant created a false appearance,

independent from Homestore's misreporting of the income from these transactions as unrelated to any previous transaction. There are no allegations that show how the creation of the RETT and its funding by Cendant for future transactions with Homestore had the potential to misrepresent the reality behind the transactions.[7] In fact, the press release from Cendant quoted in the FACC acknowledges that subsequent purchases by Cendant were planned in conjunction with Homestore's acquisition of Cendant's websites.

**[14]** Although the creation of separate entities may indicate an attempt to conceal the source of funding for related transactions, *see Lernout*, 236 F. Supp. 2d at 173, the FACC does not allege that Cendant's specific actions in these transactions created a false appearance independent of the improper accounting by Homestore. The FACC does not allege with particularity that Cendant acted with the purpose and effect of creating a false appearance of Homestore revenues with the aim of deceiving the investing public, and we conclude that the complaint was properly dismissed against Cendant and Smith.

## C.  Primary Liability of L90

**[15]** The allegations involving L90 similarly fail to allege sufficiently that L90 used or employed a deceptive device by engaging in a fraudulent transaction as part of a scheme to defraud. There are no allegations that L90 helped to create or concoct this scheme, which allegedly followed the model set by AOL. As with AOL, there are no allegations that L90 acted with the purpose and effect of creating a false appearance in these transactions.

---

[7]In its opening brief, Plaintiff argues that Cendant took affirmative steps to conceal the true nature of the Move.com transaction. The paragraph in the complaint cited for this assertion only states that Cendant classified the $95 million funding of RETT as a "one time non-recurring expense." The FACC does not explain how this classification is false or a mischaracterization of the transaction.

Mark Roah, an officer for L90, allegedly signed a false statement attesting to the fact that the transactions were not contingent on other related transactions, which may suffice to state a valid claim for primary liability under § 10(b). The day after the false confirmation letter was signed by Roah, however, Homestore's CFO refused to sign the financial report based on the misstatements within the report. The information contained in the false confirmation letter by L90, or any other false statement which resulted from this confirmation letter, was never introduced into the securities market as part of a scheme to defraud. Therefore, this statement was never used or employed in connection with the purchase or sale of securities and the allegations concerning the statement cannot state a valid claim under § 10(b).

## V

[16] Because the FACC does not allege a valid claim for primary liability under any theory of liability, the district court properly dismissed the claims in the FACC against the Defendants. Dismissal without leave to amend is improper, however, unless it is clear that Plaintiff could not propose an amended complaint that states a valid claim under § 10(b) for any of these Defendants. *See Livid Holdings*, 416 F.3d at 946. "Leave to amend need not be granted when an amendment would be futile." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002). Futility of amendment may be shown by Plaintiff's failure to plead additional facts when given the opportunity. *See id.* at 1098 ("When given the opportunity, the plaintiffs declined to say what additional facts they might plead if given the chance to amend."). Here, the district court applied a more restrictive test of primary liability than called for under § 10(b). Plaintiff was not offered the opportunity to state any additional facts that, if alleged, would state a valid claim for relief under the standards we have set forth.[8]

---

[8]Plaintiff raised the issue of amendment of the complaint in its briefing in the district court and on appeal. In the district court, Plaintiff argued in

We conclude that Plaintiff should have the opportunity to seek leave to file an amended complaint that may take advantage of the reasoning in this opinion. "In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). On remand to the district court, Plaintiff may argue to the district court that an amendment would not be futile based on the presence of additional relevant facts which it may plead. Defendants may argue any ground that they assert for denial of any proposed amendment. The district court may then decide in the first instance whether any amended complaint may be filed.[9]

---

its opposition to Defendants' motions to dismiss that leave to amend should be granted if the district court found that the current complaint failed to state a valid claim. In its briefing to us, Plaintiff did not seek leave to amend until its reply brief. "We will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal quotation marks omitted). However, "we may review an issue if the failure to raise the issue properly did not prejudice the defense of the opposing party." *Id.* We determine that review of the issue of amendment does not prejudice the defense of the Defendants because we only remand the issue of amendment for the district court to assess in the first instance, after the parties have had an opportunity to address the standards for amendment and whether it is futile under the legal standard we have announced concerning the elements of § 10(b).

[9]If the district court decides to grant leave to amend, then the motion to dismiss filed by Defendant Smith must be resolved. Smith argues that he must be dismissed from any further litigation in this case because a Settlement Agreement between Plaintiff and Homestore released from liability all former officers and directors of Homestore, which included Smith. Plaintiff argues that Smith was excluded from this release because of his position with Cendant, which was the primary source of his alleged liability in this case. This issue will be moot if amendment is not permitted. Moreover, if necessary, the district court, which approved this Settlement Agreement, may interpret this Agreement and any admissible extrinsic evidence in the first instance. We leave this motion for consideration by the district court.

## VI

**[17]** We affirm the district court's dismissal of the current complaint against Defendants. We remand so that Plaintiff may seek leave in the district court to amend the complaint if that can be done consistent with this opinion. Costs are awarded to Defendants-Appellees.

**AFFIRMED and REMANDED for further proceedings consistent with this opinion.**